## H. HAFNER & SONS, INC. et al., Appellants,

### v.

## CINCINNATI METROPOLITAN SEWER DISTRICT et al., Appellees.

[Cite as *H. Hafner & Sons, Inc. v. Cincinnati Metro.
Sewer Dist.* (1997), 118 Ohio App.3d 792.]

Court of Appeals of Ohio,
First District, Hamilton County.

No. C–960648.

Decided March 19, 1997.

*William E. Flax,* for appellants.

*Fay D. Dupuis,* City Solicitor, and *Geri Hernandez Geiler,* for appellees.

SHANNON, Judge.

Plaintiffs-appellants H. Hafner & Sons, Inc. and Toad, Inc. ("Hafner") allege that in 1994, a sanitary sewer line operated across their land "erupted" and

deposited raw sewage and human waste over approximately two acres of their property.

The record reveals that the sewer line in question is an interceptor sewer that receives sanitary flow during dry weather and a combination of sanitary flow and storm-water runoff during wet weather. This flow is conveyed by the sewer line to the Little Miami Treatment Plant ("the Plant"). Apparently, the Plant would be flooded and damaged by the combined flow through this sewer any time that the Little Miami River reached water surface levels corresponding to an Ohio River stage of forty-three feet. To protect the Plant, the interceptor sewer is equipped with a sluice gate that defendant-appellee Cincinnati Metropolitan Sewer District ("MSD") closes to block the flow any time there is a danger that the sewer flow will flood the Plant. Testimony indicates that this is an annual event.

When the sluice gate is closed, the sewer backs up. Hafner's property is located in a flood plain with four manholes from the sewer. The backup from the closed sluice gate overflows through these manholes and deposits huge quantities of raw sewage and human waste products on Hafner's land.

The MSD had notice of these backups as early as 1983, but as of this litigation had done nothing to alleviate the problem.[1] In 1994, the overflow was so great that it allegedly covered approximately two acres of Hafner's land. In Hafner's words:

"A: It used to be farming area.

"Q: What is it now?

"A: About 20, 30 inches of crap, whatever come[s] out of sewers.

"Q: And is it still there?

"A: Yep."

Based upon these facts, Hafner filed his action with little more specificity than to indicate that he believes that the MSD, through defendant-appellee Hamilton County Board of Commissioners ("the county"), is liable for the removal of the sewage from his property and resultant damage to the property's value. Following an arbitration award to Hafner, the county filed an appeal in the court of common pleas and a motion for summary judgment. Following a review of two depositions, a letter and various filings and briefs, the trial court entered summary judgment for the county.

---

1. At the time of this litigation, the MSD was in the process of obtaining an easement to install a trunk sewer.

Hafner has appealed to this court, alleging in one assignment of error that the trial court erred in granting summary judgment because (1) the operation and maintenance of a sewer system is proprietary, implying that municipalities may be held liable for negligent operation and/or maintenance; (2) the easement through Hafner's property did not authorize the MSD to overburden the easement, implying that the overflow constituted a taking of Hafner's property; and (3) a municipality that operated a sewer system that was so inadequate that it overflowed onto Hafner's property created either a nuisance or an appropriation by encroachment.

Therefore, we must first decide whether the damage to Hafner's property from the sewer was caused by governmental or proprietary functions of the county to determine whether the county is entitled to immunity. If the county is not immune from liability, we must determine whether a cause of action exists to hold it liable for the damage to Hafner's property.

We turn first to what functions of the sewer system caused the damage, whether these functions are proprietary, and whether municipalities may be held liable for these functions.

R.C. 2744.02(B)(2) states that a political subdivision is liable in damages in a civil action for loss to property allegedly caused by an act or omission of the political subdivision or of any of its employees "with respect to proprietary functions of the political subdivisions."

Hafner claims that the MSD's operation of the sewer caused the damage. R.C. 2744.01(G)(2)(d) defines as one "proprietary function" "the maintenance, destruction, operation, and upkeep of a sewer system."

The county claims that the backup was caused by the design of the sewer system, a governmental function that entitles municipalities to immunity. See R.C. 2744.01(C)(2)(*l*).[2]

Thus, the question of whether the county may be liable turns on whether the backup was caused by the design of the interceptor sewer or whether the backup was caused by the maintenance, operation and upkeep of the sewer.

According to G. Stephen Minges, Superintendent of the Waste Water Collection Division of the MSD, the sewer was most probably designed and installed in the early 1950s. The first complaints to speak of with regard to overflow from the sewer in question occurred in April 1983, when Hafner first complained about sewage overflow from the interceptor sewer. The inspector, City Engineer J.A.

---

**2.** R.C. 2744.01(C)(2)(*l*) defines as one "governmental function" "[t]he provision or nonprovision, planning or design, construction, or reconstruction of a public improvement, including, but not limited to, a sewer system."

Bishof, stated in a letter to the MSD that the overflow "represent[s] a nuisance to Mr. Ha[f]ner and a potential health hazard to the community."

There is scant evidence in the record to identify a cause for the sudden overflow that did not exist previously, but Hafner reasonably opined in his deposition testimony that the increase in upstream subdevelopments had caused a corresponding increase in flow through the sewer in question.

While Hafner had no complaints before 1983, the frequency and volume of backups increased until 1994, when the backup covered two acres of his property. It is premature to suggest that evidence could not be produced to show that the sewer, while designed to be adequate [3] in the 1950s, is no longer adequate in the 1990s. But it remains clear that Hafner has suffered through backups every year since bringing this action.

██ Both parties see the operative act as the closing of the sluice gate. The county sees this act as a discretionary function of the government to protect the Plant. We see this as an issue of fact (1) whether the closing of the gate was an act within the scope of MSD's authority, (2) whether the act involved the exercise of discretion and judgment, and (3) whether the gate was closed in good faith. *C & D Partnership v. Gahanna* (1984), 15 Ohio St.3d 359, 15 OBR 480, 474 N.E.2d 303. However, this act is not the dispositive act in this case, because the county had sufficient notice—eleven years of notice—of the problem with this sewer overflowing onto Hafner's property without taking any action to solve the problem.

The dispositive act, or in this case omission, to be proven by Hafner is the MSD's failure to maintain the sewer servicing upstream property owners—or more specifically, MSD's failure to upgrade the sewer from its original design to adequately accept the flow of sanitary effluents, despite eleven years of notice that the sewer periodically, and eventually annually, backed up and deposited raw sewage and human waste on Hafner's property.

Particularly instructive in defining MSD's omission as either proprietary or governmental are cases decided prior to the 1985 passage of the Ohio Political Subdivision Tort Liability Act, which abrogated the public-duty/special-duty theory of municipal liability. See, generally, R.C. Chapter 2744. The Eighth District Court of Appeals, for example, held that "where a municipality fails to *maintain* a public improvement such as a sewer system and thereby effectively takes private property in that municipality for its own use by casting surface waters upon that property, it must pay compensation for the property taken

---

3. "Adequate," in this context, means sufficient to prevent some indeterminate number of acres of Hafner's property from being covered by some indeterminate amount of raw sewage and human waste.

under Art. I, Sec. 19 of the Ohio Constitution." (Emphasis added.) *November Properties, Inc. v. Mayfield Hts.* (Dec. 6, 1979), Cuyahoga App. No. 39626, unreported (citing *Masley v. Lorain* [1976], 48 Ohio St.2d 334, 2 O.O.3d 463, 358 N.E.2d 596).

■ The courts have clearly considered the inadequacy of sewers to be a failure to maintain them in a manner to adequately accept upstream flow, rather than to reflect a defective design. We agree with this reasoning. The design of the 1950s in this case was apparently adequate—until 1983.

Thus, we hold that the failure to upgrade sewers that are inadequate to service upstream property owners despite sufficient notice of the inadequacy can best be described as a failure to maintain or upkeep the sewer. See, also, *Hedrick v. Columbus* (Mar. 30, 1993), Franklin App. Nos. 92AP–1030 and 92AP–1031, unreported, 1993 WL 104713. But, see, *Alden v. Summit Cty.* (1996), 112 Ohio App.3d 460, 679 N.E.2d 36. If proven, this failure would constitute the breach of a proprietary duty and would expose the county to liability under R.C. 2744.02(B)(2). Therefore, summary judgment is premature in this case.

■ As an affirmative defense, the county claims that it cannot be held liable because the backup was caused by an act of nature. This defense is appropriate in cases where "extreme natural events * * * cannot be realistically engineered against." *Hedrick, supra;* see, also, *Piqua v. Morris* (1918), 98 Ohio St. 42, 120 N.E. 300. The backups in this case are the result not of "one-hundred-year rains" but of mere annual precipitation. Thus, this defense lacks merit in this case.

It seems clear that additional evidence must be presented before a satisfactory resolution can be achieved in this case. Hafner must demonstrate that a failure to upgrade the sewer from its original design to adequately accept the flow, despite eleven years of notice that the sewer periodically overflowed on Hafner's property, caused the damage to Hafner's property. Currently, there is only an *ipso facto* assertion that the sewer design of the 1950s is no longer adequate in the 1990s. However, this assertion, in addition to the obvious length of the notice, the severity of the problem and the frequency of its occurrence, is sufficient to defeat a motion for summary judgment. In *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 662 N.E.2d 264, the Ohio Supreme Court held that the party moving for summary judgment must be able to point to some specific evidence of the type listed in Civ.R. 56(C) that affirmatively shows that the nonmoving party has no evidence to support its claims. Here, the county's conclusory assertion that Hafner has no evidence to present is insufficient to identify the absence of a genuine issue of material fact.

Accordingly, we sustain the assignment of error, reverse the entry of summary judgment and remand the cause to the trial court for further proceedings consistent with this decision.

*Judgment reversed*
*and cause remanded.*

HILDEBRANDT, P.J., and SUNDERMANN, J., concur.

. RAYMOND E. SHANNON, J., retired, of the First Appellate District, sitting by assignment.