INLAND PRODUCTS, INC., Appellee,

v.

CITY OF COLUMBUS, Appellant, et al.

[Cite as *Inland Prods., Inc. v. Columbus*, 193 Ohio App.3d 740, 2011-Ohio-2046.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 10AP–592.

Decided April 28, 2011.

742

Vorys, Sater, Seymour & Pease, L.L.P., Michael J. Canter, Gerald P. Ferguson, and Martha C. Brewer, for appellee Inland Products, Inc.

Richard C. Pfeiffer Jr., Columbus City Attorney, and Westley M. Phillips, Assistant City Attorney, for appellant.

FRENCH, Judge.

{¶ 1} Defendant-appellant, the city of Columbus (the "City"), appeals the decision of the Franklin County Court of Common Pleas, denying its motion for summary judgment on the claims of plaintiff-appellee, Inland Products, Inc. ("Inland"). For the following reasons, we affirm in part and reverse in part.

{¶ 2} Inland initiated this action against the City, the City's Department of Public Utilities, and Cheryl L. Roberto, Director of Public Utilities, on November 20, 2006.[1] Inland, an Ohio corporation, owned real property with various buildings located at 599 Frank Road in Columbus, and operated an animal-rendering business from it. Inland alleged that, in or around the middle of December 2004 through the middle of January 2005, an "enormous quantity and volume of untreated, sanitary wastewater" backed up the City's combined sani-

---

1. Inland voluntarily dismissed Roberto on February 8, 2007, and the trial court dismissed the Department of Public Utilities on March 14, 2007.

tary and storm-sewer trunk line into the lateral line connecting it with Inland's property and then into and upon Inland's property and buildings. Inland alleged damages in excess of $4,000,000, proximately caused by the City's negligent operation of its sewer system.

{¶ 3} The City experienced particularly wet winter weather during the time frame alleged in Inland's complaint. In late December 2004, over six inches of snow fell, resulting in ground saturation. Shortly thereafter, an estimated 4.94 inches of rain fell from January 3 to January 6, 2005. On January 6, 2005, the Scioto River crested at 26.57 feet, a 37–year river stage.[2] The heavy rains, coupled with already saturated ground conditions, contributed to the inflow and infiltration of groundwater and stormwater into the City's sewer system.

{¶ 4} The City's complex sewer system is composed of, among other things, combined and separate sewers, pump stations, overflow structures, storm tanks, and two wastewater-treatment plants, the Jackson Pike Wastewater Treatment Plant ("Jackson Pike") and the Southerly Wastewater Treatment Plant ("Southerly"). Discussion of Inland's claims requires an understanding of various components of the City's sewer system, particularly those facilities located between Jackson Pike, to the south, and Whittier Street, to the north.

{¶ 5} The Olentangy–Scioto Interceptor Sewer ("OSIS") is a 108–inch combined sewer line that collects both wastewater and stormwater from northwest and downtown Columbus and conveys it to a Flow Diversion Structure ("FDS") immediately north of Jackson Pike. The OSIS flows on the east side of the Scioto River to the Greenlawn Dam, south of Whittier Street, where it is joined by the Old Main (also known as the Franklin Main) and the Deshler Avenue Interceptor Sewer (also known as the Alum Creek Intercepting Sewer), sanitary sewers that carry only sanitary wastewater. From there, the OSIS flows on the west side of the Scioto River, passing under Berliner Park and Inland's property, to the FDS. In addition to Jackson Pike and the FDS, other facilities relevant to Inland's claims are the Whittier Street Storm Standby Tanks facility ("Whittier Facility"), the Renick Run Pump Station and grit tank facility, located in Berliner Park, and Design Relief Number 083 ("DSR 083").

{¶ 6} The Whittier Facility provides primary treatment when flow in the OSIS exceeds the capacity of the sewer system. When flow in the OSIS at the Whittier Facility reaches a certain elevation, the flow enters the storm standby tanks, which permit the settling of solids. Sludge pumps collect the settled sludge and discharge it to the OSIS downstream, where it is treated at a wastewater-treatment plant. When the storm tanks become full, the treated effluent discharges over a weir to an overflow channel that discharges to the

---

2. This is an elevated river stage that has a probability of occurring once every 37 years.

Scioto River. The Whittier Facility contains various gates, including two regulator gates, three emergency outlet gates, three isolation gates (also called "shut-off gates"), and two storm overflow gates. The Whittier Facility isolation gates (the "isolation gates") are located downstream of where the Old Main and Deshler Avenue Interceptor Sewer join the OSIS, and closing those gates would isolate the flow and prevent it from continuing downstream. The isolation gates, thus, "effectively provide a way * * * to stop flows from these other two sewers from heading downstream in the OSIS." The isolation gates, which were inoperable in December 2004 and January 2005, were in a fully open position and could not be closed.

{¶ 7} South of the Whittier Facility, the OSIS passes under Berliner Park, where the former Renick Run Pump Station and grit tank facility were located. The Renick Run Pump Station formerly pumped excess flows directly to the Scioto River, but the pump station was decommissioned prior to December 2004. The grit tank facility provided a way to remove inorganic sandy material from the collections system, but, prior to December 2004, the grit tank facility was decommissioned in connection with the construction of a new grit facility at Jackson Pike. Nevertheless, a bypass channel gate (the "grit gate") remained in place, in an open position, and operable in January 2005. Like the isolation gates, the grit gate would stop the flow in the OSIS from the north if closed.

{¶ 8} The OSIS continues south of Berliner Park under Inland's property to the FDS, located immediately north of Jackson Pike. All flows that enter Jackson Pike must first pass through the FDS, which was designed to manage flows from three sewers. In addition to the OSIS's connection from the north, the Scioto Main Replacement Sewer ("Scioto Main"), a 120–inch sewer, connects to the FDS from the northwest, and the Interconnector Sewer, which connects the Jackson Pike and Southerly service districts, connects to the FDS from the southwest. Using sluice gates, workers at Jackson Pike are able to control the flows entering and leaving the FDS from each of the connected sewer lines. Of particular importance to this case is the FDS north sluice gate ("FDS North Gate"), installed in 2003, which allowed the City to control the flow of the OSIS into the FDS and on to Jackson Pike.

{¶ 9} The Scioto Main was designed in connection with the West Columbus Local Protection Project ("WCLPP"), a joint federal and City project that involved the construction of a floodwall by the U.S. Army Corps of Engineers. The floodwall, which was substantially complete in 2004, removed approximately 2,800 developed acres on the west side of the Scioto River from floodplain restrictions and provides flood protection for approximately 470 commercial and 4,000 residential structures. Jackson Pike is responsible for treating flows from the Scioto Main. The Scioto Main provides sanitary sewer service to the area

protected by the southern alignment of the floodwall. If the Scioto Main surcharges (fills beyond capacity) during a wet-weather event, the area protected by the floodwall is vulnerable to flooding. The City has an obligation to operate the WCLPP and its internal drainage features. Neither Berliner Park nor Inland's property is protected by the floodwall.

{¶ 10} In December 2004 and January 2005, Jackson Pike had a designed capacity to treat an average of 68 million gallons of wastewater per day and a designed peak treatment capacity of 102 million gallons of wastewater per day. Jackson Pike has two bypass mechanisms, a mechanical, pumped bypass to pump flows directly to the Scioto River when plant capacity is exceeded, and a hydraulic (or gravity) bypass to protect the plant and sewer from excess flows. The hydraulic bypass operates like a window. When the elevation in the Jackson Pike wet well rises above the sill of the window, excess wastewater flows into a ditch on the north boundary of the plant, along the southern end of Inland's property. The hydraulic bypass did not activate during the January 2005 wet-weather event, but the mechanical bypass operated during that time frame.

{¶ 11} The Interim Interconnector Sewer Operational Plan ("IISOP"), compiled and updated by the City and its consulting engineers, provides a uniform operating strategy for combined sewer-overflow control and separate sanitary-sewer overflow control. The IISOP includes operational plans for both dry weather conditions and wet weather flow conditions. The City updated the IISOP plan for wet-weather flow conditions on September 15, 2004. With respect to wet-weather flow conditions, the IISOP sets forth a sequence of 13 actions to handle increasing flows in the collections system. Although the 13 steps are generally listed in sequential order, the sequence and timing are dictated by, among other factors, the availability of wastewater-treatment capacity, conditions in the collections system, and the river stage. Among the 13 steps is the diversion of OSIS flows through the Whittier Facility by throttling the regulator gates at the Whittier Facility. Step seven instructed City employees to "[t]hrottle the [FDS North Gate] to isolate the Scioto Main flows from the OSIS downstream of the Whittier [Facility]."

{¶ 12} On the morning of January 3, 2005, City workers closed the FDS North Gate for approximately two hours, preventing flows in the OSIS from entering the FDS and continuing on to Jackson Pike. The City again closed the FDS North Gate at 5:30 p.m. on January 5, 2005, and that gate remained closed until 12:20 p.m. on January 6, 2005. Dax Blake, Administrator of the Division of Sewerage and Drainage of the City's Department of Public Utilities, stated that Jackson Pike pumped to its maximum rate while the FDS North Gate was closed and that opening the FDS North Gate would likely have caused the Jackson Pike hydraulic bypass to activate.

{¶ 13} In January 2005, large amounts of groundwater, stormwater, and wastewater flow caused the OSIS to become surcharged, i.e., beyond the point of being full. In December 2004 and January 2005, surcharging in the OSIS between the Whittier Facility and Jackson Pike was designed to relieve at DSR 083, an overflow structure east of the Whittier Facility. DSR 083 was designed to allow excess flow from the Old Main, the Deshler Avenue Interceptor Sewer, and the OSIS to be relieved directly to the Scioto River through an outlet pipe containing two flapgates to prevent river water from backing up into the sewer system. The elevation of DSR 083 is lower than the elevation of either Inland's property or Berliner Park. The City contends, however, that the elevation of the Scioto River in early January 2005 put pressure on the flapgates of DSR 083 and prevented them from opening to relieve the OSIS.

{¶ 14} Unable to discharge from DSR 083, the surcharged OSIS relieved at the next lowest elevations, via the manhole covers in Berliner Park and at Inland's animal-rendering plant, which was tapped into the sewer system immediately adjacent to the OSIS through two private sewer laterals. Flooding from the manhole covers in Berliner Park was observed on the morning of January 3, 2005. Gary Hickman, the Jackson Pike plant manager, personally observed water surcharging from the manhole covers in Berliner Park and was aware of surcharging on Inland's property. Inland's president, Gary Baas, testified about two instances of wastewater flooding into the Inland plant, filling the ground floor of the plant to a depth of 18 inches on the first occasion and to 24 inches on the latter occasion. Baas testified that wastewater also flooded from a manhole cover on Inland's property outside the plant. He stated that the flooding occurred two times in three days, but the record contains no evidence of the exact time or dates of the flooding on Inland's property. Prior to this event, Inland had never experienced a sewer backup. The City contends that the flooding of Inland's property "occurred because the capacity of the OSIS was exceeded by inflow and infiltration of groundwater, stormwater, and wastewater flows inundating the City's sewer system" and because the elevated river level prevented the OSIS from relieving at DSR 083. The City maintains that no act or omission by any City employee caused the flooding.

{¶ 15} On March 10, 2010, after extensive discovery, the City filed a motion for summary judgment, asserting statutory immunity under the Political Subdivision Tort Liability Act, R.C. Chapter 2744. Specifically, the City argued that Inland could not establish an exception to the general grant of political subdivision immunity and that the flooding of Inland's property was caused by an act of God, for which the City is not liable. In opposition to the City's motion, Inland argued that the City was negligent in the following five respects: the City (1) negligently operated the FDS North Gate, (2) negligently maintained and failed to close the

isolation gates, (3) negligently operated the Whittier Facility sludge pumps, (4) negligently operated the sewer system, and (5) negligently operated the grit gate. Inland argued that each of the City's alleged negligent acts or omissions related to the proprietary function of operating a sewer system, such that political-subdivision immunity did not shield the City from liability.

{¶ 16} After full briefing and oral argument, the trial court denied the City's motion for summary judgment on June 4, 2010. The trial court concluded that the record contained evidence from which reasonable minds could conclude that an exception to political-subdivision immunity applied and that no defense applied to reinstate immunity. The trial court also determined that the case presented a genuine issue of material fact as to whether the flooding on Inland's property was caused by an act of God.

{¶ 17} R.C. 2744.02(C) provides that an order denying a political subdivision the benefit of an alleged immunity is a final order, and the City filed a timely notice of appeal from the trial court's June 4, 2010 decision and entry. The City asserts the following assignments of error:

First Assignment of Error

The trial court erred in concluding that the City is not immune from liability for the design of its sewer system.

Second Assignment of Error

The trial court erred in concluding that the defense in R.C. 2744.03(A)(5) does not provide the City with a defense against liability from Inland's claim that the City negligently operated its sewer system.

Third Assignment of Error

The trial court erred in concluding that the City is not immune from liability for Inland's claim that the City negligently operated the [FDS North Gate].

Fourth Assignment of Error

The trial court erred in concluding that the City is not immune from liability for Inland's claim that the City negligently failed to maintain and negligently failed to close the three [isolation] gates located at the [Whittier Facility].

Fifth Assignment of Error

The trial court erred in concluding that the City is not immune from liability for Inland's claim that the City negligently operated the sludge pumps in the [Whittier Facility].

Sixth Assignment of Error

The trial court erred in concluding that the City is not immune from liability for Inland's claim that the City negligently operated the grit gate in Berliner Park.

{¶ 18} When an appellate court reviews a trial court's disposition of a summary-judgment motion, it applies the same standard as the trial court and conducts an independent review, without deference to the trial court's determination. *Maust v. Bank One Columbus, N.A.* (1992), 83 Ohio App.3d 103, 107, 614 N.E.2d 765; *Brown v. Scioto Cty. Bd. of Commrs.* (1993), 87 Ohio App.3d 704, 711, 622 N.E.2d 1153. Pursuant to Civ.R. 56(C), summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Accordingly, summary judgment is appropriate only under the following circumstances: (1) no genuine issue of material fact remains to be litigated, (2) the moving party is entitled to judgment as a matter of law, and (3) viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can come to but one conclusion, that conclusion being adverse to the nonmoving party. *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66, 8 O.O.3d 73, 375 N.E.2d 46.

{¶ 19} Because the City's assignments of error all stem from the trial court's immunity analysis, we begin with a discussion of the statutory provisions regarding political-subdivision immunity. R.C. Chapter 2744 establishes a three-tiered analysis for reviewing claims of political-subdivision immunity. *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, ¶ 7. For purposes of R.C. Chapter 2744, the functions of political subdivisions are classified as either governmental functions or proprietary functions. R.C. 2744.02(A)(1). The first tier of analysis is simply the general rule that "a political subdivision is not liable in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." Id. Next, R.C. 2744.02(B) sets forth five exceptions to the general rule. The only exception relevant here states that "political subdivisions are liable for injury, death, or loss to person or property caused by the negligent performance of acts by their employees *with respect to proprietary functions* of the political subdivisions." (Emphasis added.) R.C. 2744.02(B)(2). Finally, if an exception applies, the political subdivision may assert one of the affirmative defenses in R.C. 2744.03 to reinstate immunity. *Colbert* at ¶ 9. Here, the City claims that, even if R.C. 2744.02(B)(2) applies, it is entitled to the defense stated in R.C. 2744.03(A)(5), which provides that "[t]he political subdivision is immune from liability if the injury, death, or loss to person or property resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources

unless the judgment or discretion was exercised with malicious purpose, in bad faith, or in a wanton or reckless manner."

{¶ 20} The general rule of immunity undisputedly shields the City from liability unless Inland demonstrates the applicability of the R.C. 2744.02(B)(2) exception for negligence with respect to a proprietary function. R.C. 2744.01 sets forth mutually exclusive definitions of governmental and proprietary functions. *Smith v. Martin*, 176 Ohio App.3d 567, 2008-Ohio-2978, 892 N.E.2d 971, ¶ 16. R.C. 2744.01(C)(1) and (G)(1) set forth general definitions of governmental function and proprietary function, respectively, whereas R.C. 2744.01(C)(2) and (G)(2) respectively offer nonexhaustive examples of specific governmental and proprietary functions. Under R.C. 2744.01(C)(2)(*l* ), "[t]he provision or nonprovision, planning or design, construction, or reconstruction of a * * * sewer system" is a governmental function, and, under R.C. 2744.01(C)(2)(r), "[f]lood control measures" are governmental functions. In contrast, under R.C. 2744.01(G)(2)(d), "[t]he maintenance, destruction, operation, and upkeep of a sewer system" is a proprietary function. The City maintains that Inland's allegations relate to the governmental functions of sewer design or flood control, whereas Inland contends that it is alleging negligence with respect to the proprietary functions of sewer operation and maintenance.

{¶ 21} The City's first assignment of error states that the trial court erred by concluding that the City is not immune from liability for the design of its sewer system. In response, Inland reiterates that it is claiming negligence not with respect to the design of the sewer system, but with respect to the City's maintenance, operation, and upkeep of its sewer system.

{¶ 22} In a common thread running through its assignments of error, the City argues that R.C. 2744.02(B)(2) cannot apply because Inland's allegations of negligence relate to the City's design of the sewer system, a governmental function. The City maintains that the IISOP is a vital part of the design of the sewer system and that Inland's arguments regarding the content and development of the IISOP, as well as its allegations regarding compliance with the IISOP, are attacks on that design. Thus, the City contends that Inland's claims, including those stemming from the closing of the FDS North Gate, the failure to maintain and close the isolation gates, the operation of the Whittier Facility sludge pumps, and the operation of the grit gate, allege negligence with respect to the governmental function of sewer design. Inland, on the other hand, argues that the City's broad interpretation of governmental function would unjustifiably encompass virtually any action by a political subdivision with respect to a sewer system, in disregard of the statutory distinction between design, as a governmental function, and operation and maintenance, as proprietary functions.

{¶ 23} In *Doud v. Cincinnati* (1949), 152 Ohio St. 132, 137, 39 O.O. 441, 87 N.E.2d 243, the Supreme Court of Ohio explained as follows:

A municipality is not obliged to construct or maintain sewers, but when it does construct or maintain them it becomes its duty to keep them in repair and free from conditions which will cause damage to private property; and in the performance of such duty the municipality is in the exercise of a ministerial or proprietary function and not a governmental function within the rule of municipal immunity from liability for tort. The municipality becomes liable for damages caused by its negligence in this regard in the same manner and to the same extent as a private person under the same circumstances.

Although *Doud* predates the Public Subdivision Tort Liability Act, the rationale of *Doud* was codified in that act, and Ohio courts have continued to follow the common-law rationale under the immunity statutes. See *Trustees of Nimishillen Twp. v. State ex rel. Groffre Invests.*, 5th Dist. No. 2003 CA 00410, 2004-Ohio-3371, 2004 WL 1445235, ¶ 38, citing *Best v. Findlay* (Dec. 5, 1997), 3d Dist. No. 5-97-22, 1997 WL 746768, and *Nice v. Marysville* (1992), 82 Ohio App.3d 109, 611 N.E.2d 468. As under the common law, under R.C. Chapter 2744, certain actions with respect to a city sewer system are governmental functions, while other actions with respect to a city sewer system are proprietary functions.

{¶ 24} The R.C. 2744.01(C)(2)(*l*) definition of "governmental function" includes the "provision or nonprovision, planning or design, construction, or reconstruction of a public improvement, including * * * a sewer system," whereas the R.C. 2744.01(G)(2)(d) definition of "proprietary function" includes the "maintenance, * * * operation, and upkeep of a sewer system." The City argues that the "design" of a sewer system encompasses an operating plan, like the IISOP, and all actions in compliance with the operational steps detailed in such a plan.

{¶ 25} In construing statutory language, we assign the words their plain, ordinary meaning unless the General Assembly has clearly expressed a contrary intent. *Albright v. Limbach* (1988), 37 Ohio St.3d 275, 278, 525 N.E.2d 801. Additionally, we read undefined words and phrases in context and construe them according to rules of grammar and common usage. R.C. 1.42; *State ex rel. Plain Dealer Publishing Co. v. Cleveland*, 106 Ohio St.3d 70, 2005-Ohio-3807, 831 N.E.2d 987, ¶ 35. "As a further aid[ ] in determining the meaning of an undefined term, the maxim of *noscitur a sociis*—it is known from its associates—directs [a court] to look to accompanying words to deduce the undefined word's meaning." *The Limited, Inc. v. Commr. of Internal Revenue* (C.A.6, 2002), 286 F.3d 324, 332; *Bungard v. Dept. of Job & Family Servs.*, 10th Dist. No. 07AP-447, 2007-Ohio-6280, 2007 WL 4171105, ¶ 12. That maxim follows from the premise that " 'the coupling of words denotes an intention that they should be understood in the same general sense.' " *Wilson v. Stark Cty. Dept. of Human*

*Servs.* (1994), 70 Ohio St.3d 450, 453, 639 N.E.2d 105, quoting 2A Sutherland, Statutory Construction (5 Ed.Singer Rev.1992) 183, Section 47.16.

{¶ 26} R.C. Chapter 2744 does not define "design," so we first look to the plain and ordinary meaning of that term. In the context of R.C. 2744.01(C)(2)(*l* ), "design" is a noun, the ordinary dictionary definition of which includes the following:

> 9. an outline, sketch, or plan, as of the form and structure of a work of art, an edifice, or a machine to be executed or constructed. * * * 11. the combination of details or features of a picture, building, etc.; * * * 13. a plan or project: *a design for a new process.*

Webster's Encyclopedic Unabridged Dictionary (Portland House 1997).

{¶ 27} We also look to the plain and ordinary meaning of the other terms within the R.C. 2744.01(C)(2)(*l* ) definition of "governmental function" as the provision, nonprovision, planning, construction, and reconstruction "of a public improvement, including * * * a sewer system." "Provision" means "the providing or supplying of something" or "something provided; a measure or other means for meeting a need." Webster's Encyclopedic Unabridged Dictionary (Portland House 1997). As a noun, "plan" is defined as follows:

> 1. a scheme of action or procedure: *battle plans.* 2. a design or scheme of arrangement: *an elaborate plan for seating guests.* 3. a project or definite purpose: *plans for the future.* 4. a drawing made to scale to represent the top view or a horizontal section of a structure or a machine, as a floor plan of a building. 5. a representation of a thing drawn on a plane, as a map or diagram: *a plan of the dock area.*

Id. As relevant here, "construction" means: "1. the act or art of constructing. 2. the way in which a thing is constructed; structure * * * 3. something that is constructed; a structure." Id. "Construct," in turn, is defined as "to form by putting together parts; build; frame; devise." Id.

{¶ 28} Even were we to conclude that the design or planning of a sewer system could encompass the creation of an operational plan, like the IISOP, we would nevertheless conclude that actions taken to operate the system, whether pursuant to or in deviation from the operational plan, fall not under the concept of sewer design, but under the proprietary function of sewer operation. "Operation" means "the act or an instance, process, or manner of functioning or operating" or "a course or procedure of productive or industrial activity." Id. By its separate classification of sewer maintenance, operation, and upkeep as proprietary functions, distinct from the governmental functions of provision, nonprovision, planning, design, construction, and reconstruction of a sewer system, the General Assembly excluded maintenance, operation, and upkeep from the concept of a sewer system's design.

{¶ 29} The City's interpretation, that the performance of operational steps set forth in the IISOP is part of the sewer system's design, would essentially render any operational activity a governmental function where an operating plan is in place. Thus, simply by compiling an operating plan, a political subdivision could create immunity for the operation of its sewer system, despite the statutory classification of sewer operation as a proprietary function. Such a result is not justified under R.C. Chapter 2744. See *Bullard v. Lehigh–Northampton Airport Auth.* (Pa.Commw.1995), 668 A.2d 223, 226–227 (rejecting an argument that "design" under Pennsylvania's Political Subdivision Tort Claims Act encompassed the design of operating procedures). We therefore agree with Inland that the day-to-day aspects of maintaining and operating the sewer system, including the types of activities detailed in the IISOP, constitute proprietary functions.

{¶ 30} Our construction is consistent with decisions of Ohio courts that have applied the R.C. 2744.02(B)(2) exception where alleged negligence arises from maintenance or operation of a sewer system. For example, in *H. Hafner & Sons, Inc. v. Cincinnati Metro. Sewer Dist.* (1997), 118 Ohio App.3d 792, 694 N.E.2d 111, the First District Court of Appeals reversed summary judgment in favor of the Cincinnati Metropolitan Sewer District ("MSD") based on political-subdivision immunity, where the plaintiffs alleged that sewer backups on their property resulted from the MSD's closure of a sluice gate to block the flow of sewage into its treatment plant. The court stated that the dispositive act or omission, the MSD's alleged failure to maintain the sewer serving upstream property owners, was a proprietary function and not a matter of design. See also *Essman v. Portsmouth,* 4th Dist. No. 09CA3325, 2010-Ohio-4837, 2010 WL 3852247, ¶ 48 (assuming, without deciding, that a complaint about the manner and method of the operation of weir gates concerned a proprietary function, but stating that the city "could be subject to liability under R.C. 2744.02(B)(2) for its operation of the weir gates * * * [as] part of the operation of the sewer system"); *Keytack v. Warren,* 11th Dist. No. 2005–T–0152, 2006-Ohio-5179, 2006 WL 2796506, ¶ 31 ("Any alleged negligence in maintaining or failing to maintain a storm sewer would be classified as a proprietary function"); *Sparks v. Erie Cty. Bd. of Commrs.* (Jan. 16, 1998), 6th Dist. No. E–97–007, 1998 WL 15929 (negligence regarding tapping additional sewer lines into an existing system concerned the proprietary function of sewer operation or management); *Hedrick v. Columbus* (Mar. 30, 1993), 10th Dist. No. 92AP–1030, 1993 WL 104713 (alleged failure to maintain a concrete culvert as part of a storm-sewer system could be raised as an attack on the city's maintenance of a sewer system under R.C. 2744.01(G)(2)(d)).

{¶ 31} Inland's complaint does not allege negligence with respect to the physical design of the sewer system or negligence regarding the creation of the IISOP. Rather, Inland alleges that the City negligently *maintained* the isolation

gates by failing to repair them and that the City negligently *operated* the sewer system, including the isolation gates, sludge pumps, FDS North Gate, and grit gate. The allegations relate to the City's proprietary functions of sewer maintenance and operation. Although Inland could have alleged that the City negligently designed the sewer system or its components, Inland did not do so. Upon review, we conclude that Inland's claims relate to the operation and maintenance of the sewer system, a proprietary function, and not to the design of that system. Moreover, we conclude that the trial court did not purport to permit Inland to maintain a claim for negligence in the design of the City's sewer system. Accordingly, we overrule the City's first assignment of error.

{¶ 32} The City's remaining assignments of error correspond to the five allegations of negligence identified by Inland, and we now turn to those specific allegations. We will address each allegation, and the evidence relating to it, to determine whether the record contains evidence from which reasonable minds, viewing the evidence most favorably to Inland, could determine the issue in Inland's favor. We will also address the City's contentions that certain of Inland's allegations involve the governmental function of flood-control measures alongside our discussion of those individual allegations. Because the City's arguments under the second assignment of error concern the applicability of the defense in R.C. 2744.03(A)(5), the third tier of immunity analysis, we first address the other assignments of error, which concern the second tier of analysis.

{¶ 33} The third assignment of error asserts that the trial court erred in concluding that the City is not immune from liability for Inland's claim that the City negligently operated the FDS North Gate. The City argues that the operation of the FDS North Gate was a governmental function because it was a flood-control measure, thus precluding application of the R.C. 2744.02(B)(2) exception to immunity. According to Michael Foster, a City engineering associate, and Hickman, the FDS North Gate was designed for flood control. The City devoted a single paragraph in its motion for summary judgment to this argument, stating that the January 2005 wet-weather event was the first time Jackson Pike implemented "the designed flood control measures provided by the WCLPP" and that, by implementing those measures, "the City helped prevent flooding of the area protected by the [floodwall]."

{¶ 34} Both the IISOP and the WCLPP Operation and Maintenance Manual ("OMM") provide for operation of the FDS North Gate. Step seven of the IISOP's wet-weather flow procedures instructs City employees to "[t]hrottle the [FDS North Gate] to isolate the Scioto Main flows from the OSIS downstream of the Whittier [Facility]." The IISOP classifies key collection-system flow-control equipment as dry-weather operations equipment, wet-weather operations equipment, or flood-operations equipment. The FDS is classified as wet-weather

operations equipment, not flood-operations equipment. Of the four components classified as flood-operations equipment, three operate only at or above the 25–year river stage. The final flood-operations component, the Jackson Pike River Diversion Structure Sluice Gate, is activated "once system and plant capacity is exceeded" until "the river recedes and system and plant capacity becomes available."

{¶ 35} Describing steps to be taken during "flood events," the OMM provides as follows:

> When the Scioto River reaches the 25 year river stage, [Jackson Pike] will be taken off line and the entire plant influent will be pumped by the raw sewage pumps through the Bypass Chamber and Bypass Metering Chamber via the emergency bypass discharge line. * * *

> During the bypass condition, the raw sewage pumps will pump only flows from the Scioto Main sanitary sewer. This will be accomplished by shutting all the sluice gates at the [FDS] except the sluice gate on the 120–inch Scioto Main sanitary influent line as well as the gate on the Flow Control Structure to [Southerly]. The procedure for shutting the sluice gates is outlined in the Jackson Pike * * * SOP.

Foster testified that the OMM "flood plan requires the closure of [the FDS North Gate] above the 25–year river event." Hickman similarly testified that "[o]nce I get to a 25–year flood stage, river flood stage, my priority, my objective is to keep the flood protected area protected. To do that I pump water out of that area and that area only to the river." Blake testified that leaving the FDS North Gate open could result in floodwater entering the OSIS and going though the FDS and up the Scioto Main, behind the floodwall's line of protection. The City argued that, in closing the FDS North Gate as instructed by the OMM, it was engaged in a flood-control measure, a governmental function for which it is immune from tort liability.

{¶ 36} Whether a particular function of a political subdivision is proprietary or governmental may depend on the facts of the specific case. *Beauford v. Columbus* (Oct. 13, 1981), 10th Dist. No. 81AP–471, 1981 WL 3530, citing *Hyde v. Lakewood* (1965), 2 Ohio St.2d 155, 31 O.O.2d 313, 207 N.E.2d 547, paragraph two of the syllabus. Here, the City first closed the FDS North Gate for approximately two hours on the morning of January 3, 2005, when the elevation of the Scioto River was only at approximately a one-and-one-half to two-year river stage. Nevertheless, during the first closure, the City acknowledged manhole overflows in Berliner Park and received calls from owners of property on Greenlawn Avenue who were experiencing basement flooding. An e-mail from Hickman, dated January 4, 2005, noted that the "storm event" had resulted in "surcharging along the OSIS in Berliner Park and the compactor drain on the OSIS at the Grit

Tanks." The City again closed the FDS North Gate at approximately 5:30 p.m. on January 5, 2005, and did not reopen the gate until 12:20 p.m. on January 6, 2005. The river first reached the 25–year river stage on January 6, 2005, and remained at or above the 25–year river stage only for a portion of that day. Thus, the river was not at the 25–year river stage contemplated by the OMM when the City closed the FDS North Gate, either on January 3 or January 5.

{¶ 37} "Flood control measures" in R.C. 2744.01(C)(2)(r) will not be read in such a way as to swallow up a large part of the exception to immunity for the maintenance, operation, and upkeep of a sewer system. *Hedrick*, 1993 WL 104713. "Normal maintenance does not constitute flood control measures. Rather, flood control occurs when authorities call in political subdivision employees to contain and control impending flood damage." Id. In *Keytack*, 2006-Ohio-5179, at ¶ 23, the 11th District rejected an attempt to characterize lack of maintenance of a sewer drain as a flood-control measure; "Were we to accept appellant's characterization, the proprietary functions of sewer maintenance, operation, and upkeep would be swallowed by and transformed into the governmental function of 'flood control.' * * * Classifying all ordinary sewer maintenance as a governmental function would render R.C. 2744.01(G)(2)(d) a mere nullity." (Emphasis omitted.) Id. That rationale likewise applies to the operation of a sewer system, such that normal operation of a sewer system does not constitute "flood control measures," even if one effect of the operation is to reduce the likelihood of flooding.

{¶ 38} Here, the City's sole (and very brief) argument to the trial court was that City employees took "flood control measures" by closing the FDS North Gate pursuant to the OMM. We have concluded, however, that the OMM did not require closure of the FDS North Gate prior to a 25–year river stage, which had not been reached either time the City shut the FDS North Gate in early January 2005. Therefore, the trial court did not err by denying summary judgment on that basis. To the extent that the City is entitled to now differently argue that it took "flood control measures" when it closed the FDS North Gate pursuant to the IISOP, we note that step seven of the IISOP is part of ordinary wet-weather operations, and the FDS is not included as flood-operations equipment under the IISOP. That flooding may conceivably be reduced or eliminated as a consequence does not remove the ordinary operation of the sewer system from the definition of proprietary function. Therefore, operation of the FDS North Gate pursuant to the IISOP would not establish the taking of "flood control measures" either. While we do not preclude the possibility that other evidence may exist to establish the taking of "flood control measures," given the City's very limited grounds for summary judgment, we cannot conclude that the trial court erred by denying summary judgment.

{¶ 39} Because R.C. 2744.02(B)(2) excepts only negligence with respect to a proprietary function from immunity, Inland must still prove the requisite elements of its negligence claim:  duty, breach, proximate cause, and damages. See *Kendle v. Summit Cty.* (Apr. 15, 1992), 9th Dist. No. 15268, 1992 WL 80074; *Mussivand v. David* (1989), 45 Ohio St.3d 314, 318, 544 N.E.2d 265.  We therefore turn to the substance of Inland's claim stemming from closure of the FDS North Gate.  A political subdivision owes a duty of ordinary care with respect to the proprietary functions of operating a sewer system and maintaining that system in repair.  See *Doud* at 137, 39 O.O. 441, 87 N.E.2d 243.

{¶ 40} In its motion for summary judgment, the City argued that the level of the Scioto River prevented the sewer system from discharging from DSR 083 and that, as a result, the surcharged OSIS relieved itself at the next lowest elevations, namely Berliner Park and Inland's property.  The City maintained that no action by its employees caused the flooding of Inland's property.  Hickman testified that closing the FDS North Gate allowed the flow in the OSIS to back up to DSR 083, but that the river elevation prevented the system from discharging there. For the sewer system to discharge at DSR 083, "[t]he sewer hydraulic grade line would have to be higher than the river [elevation]."  Blake opined that, even had the FDS North Gate remained open, the river elevation would have prevented the system from discharging until the elevation in the system exceeded that of the river because "[t]here was nowhere that [the] system could have discharged that didn't involve the river elevation."

{¶ 41} Once the Scioto River reached approximately a one-and-one-half to two-year river stage on the morning of January 3, 2005, pressure from the river prevented discharge through DSR 083 until the hydraulic gradeline in the sewer line exceeded the river level.  The elevation of the Scioto River at Greenlawn Avenue was estimated at 699.9 feet at 9:00 a.m. on January 3, 2005, and exceeded 700 feet between 9:00 and 10:00 a.m. that morning.  Although DSR 083 lies at a lower elevation than Berliner Park or Inland's property, because of the elevated river level, the water level in the sewer system had to build up to an elevation greater than 700 feet to overcome the flapgates at DSR 083.  Closing the FDS North Gate increased the excess flow in the OSIS and raised the water elevation in the OSIS by at least five to seven feet.  Upon closing the FDS North Gate, the hydraulic grade line in the OSIS rose to an elevation greater than 700 feet from the FDS upstream to DSR 083.  A number of manholes in Berliner Park, however, have top casting elevations between 699.5 and 700 feet.  The record contains no evidence of the relevant elevations at Inland's property, but the City admits that the OSIS, being unable to discharge through DSR 083, began discharging from the next lowest elevations, the manholes in Berliner Park and

Inland's property. The OSIS was unable to discharge out DSR 083 after flooding from the manholes began.

{¶ 42} The fact that the IISOP provided for operation of the FDS North Gate does not preclude a finding that the City breached its duty to operate the sewer system with ordinary care by closing that gate. The IISOP does not specify when the FDS North Gate should be throttled and/or closed.[3] Rather, the sequence and timing of the steps are dictated by such factors as the availability of wastewater-treatment capacity, conditions in the collections system, and the river stage. Further, the City's ability to deviate from the IISOP is demonstrated by Hickman's closure and reopening of the grit gate, as discussed below, in relation to the City's sixth assignment of error. Hickman's authority to alter or deviate from the IISOP's operational plan is also evident from his January 4, 2005 e-mail, by which he implemented temporary modifications to the IISOP "should another event occur *within the next day or so* * * * [i]n an effort to minimize the flooding in this area." (Emphasis sic.) Notably, Hickman modified step seven to state as follows:

Throttle the [FDS North Gate] to 6″ to isolate the Scioto Main flows from the OSIS downstream of the Whittier Street Storm Standby Tanks. Contact Inland Products to let them know that the OSIS may surcharge and that they may want to plug their plant sanitary drains * * *.

The e-mail explained that "[t]he main change is to keep the [FDS North Gate] at 6″ to provide at least some hydraulic relief to the OSIS during a bypass event, unless by so doing, we compromise our ability to handle the flows from the [Scioto Main]."

{¶ 43} Despite the City's arguments to the contrary, the temporary modification of step seven suggests knowledge of a correlation between closing or throttling the FDS North Gate and surcharging of the OSIS at Inland's property. Moreover, in an attachment to an e-mail dated March 24, 2005, Hickman identified the closure of the FDS North Gate, along with the river elevation, as a cause of the January 2005 flooding. Hickman wrote, "I have always been uncomfortable about backing flows up the OSIS and out DSR 083 by throttling/closing the [FDS North Gate]. If flow is discharging out of DSR 083, obviously the storage capacity of the collections system has already been exceeded, so this practice is meaningless as being described as 'maximizing storage.'" Instead, he suggests that "[i]f our mandate is to eliminate park flooding, I believe it is operationally and environmentally more feasible to delete Step 7 (throttling

---

**3.** We do not address Inland's argument that the IISOP did not call for closure of the FDS North Gate, but only for that gate to be "throttled," because Inland did not raise that argument before the trial court.

or closing the [FDS North Gate]) from the IISOP." He asserts that the IISOP should provide for closure of the FDS North Gate only at a 25-year river stage.

{¶ 44} Inland's expert witness, Daniel Budny, Ph.D., testified that closing the FDS North Gate was a cause of the flooding in Berliner Park and on Inland's property. Budny described the closure of the FDS North Gate as "totally illogical" and "totally irresponsible" and opined that, before that gate is closed, all bypasses at the Whittier Facility, Jackson Pike, and Southerly should be at their maximum levels. In contrast to testimony offered by the City that Inland's property would have flooded even had the FDS North Gate remained open and the Jackson Pike gravity bypass activated, Budny testified that there would have been no flooding of Inland's property if the FDS North Gate not been closed completely. While the City attacks Budny's credibility by criticizing his understanding of the sewer system, credibility determinations are not appropriate in ruling on a motion for summary judgment. *Turner v. Turner* (1993), 67 Ohio St.3d 337, 341, 617 N.E.2d 1123.

{¶ 45} Upon review, we conclude that genuine issues of material fact exist as to Inland's claim that the City acted negligently in closing the FDS North Gate during the January 2005 wet-weather event and that, viewing the evidence in the light most favorable to Inland, reasonable minds could determine that the City was negligent in that regard and that the City's negligence was a proximate cause of Inland's damages. Accordingly, the trial court did not err in denying the City's motion for summary judgment with respect to Inland's claim stemming from the closure of the FDS North Gate. We therefore overrule the City's third assignment of error.

{¶ 46} The City's fourth assignment of error states that the trial court erred in concluding that the City was not immune from liability for Inland's claim that it negligently failed to maintain and negligently failed to close the isolation gates.

{¶ 47} The isolation gates at the Whittier Facility lie downstream of where the Old Main and Deshler Avenue Interceptor Sewer join the OSIS. When operable, they provide a mechanism for stopping flows from the OSIS and those other sewers from continuing downstream between the Whittier Facility and the FDS. At least one of the isolation gates was tagged by a City employee as broken or inoperable in or around 1971, and the remaining isolation gates were broken or inoperable by February 1, 2002. In December 2004 and January 2005, Hickman was responsible for the upkeep and maintenance of the isolation gates and was aware that those gates were inoperable. During that time frame, the isolation gates remained in a fully open position and could not be closed.

{¶ 48} The IISOP in effect during the January 2005 wet weather event did not mention the isolation gates, but the Standard Operating Procedures for the Whittier Facility stated that the isolation gates (referred to as "shut-off gates") "should always be left fully open." Nevertheless, had the isolation gates been operable and been closed during the January 2005 wet-weather event, the OSIS south of Whittier Street would have been isolated from the OSIS north of Whittier Street, as well as from the Old Main and Deshler Avenue Interceptor Sewer, to the extent that the isolation gates are sealable. Blake testified that if closure of the isolation gates had been part of the IISOP, the closure "would have likely or potentially" prevented flooding in Berliner Park.

{¶ 49} Budny testified that the City was negligent in failing to maintain the isolation gates in an operable condition and that the City "blundered" and "failed on a standard [preventative] maintenance plan" by permitting the isolation gates to remain inoperable. He stated that had the isolation gates been operable, the City could have almost eliminated the flow into the OSIS south of Whittier Street and could have prevented the flooding in Berliner Park and Inland's property. Budny went on to testify that the flooding of Inland's property occurred because the isolation gates were broken and because the FDS North Gate was closed.

{¶ 50} The City disagreed with Budny's opinion regarding the maintenance of the isolation gates. Several City employees testified that there was no need to repair the isolation gates because operation of those gates was no longer part of the operational plans and because the function of those gates was unnecessary. Although unaware of any analysis of whether the isolation gates should be repaired prior to January 2005, Hickman stated that operation of the isolation gates was not part of the IISOP and that the gates were abandoned in the open position. As to the necessity of the isolation gates, Hickman testified that downstream reliefs going to the Renick Run Pump Station rendered the isolation gates obsolete and that the grit gate in Berliner Park served a similar function. Hickman also testified that the FDS North Gate rendered the isolation gates unnecessary, stating, "[W]e shut off all the flow from the OSIS coming down to the plant [at the FDS North Gate] and there's an overflow backup [DSR 083] * * * that discharges water that can't be processed at the plant out that relief." The Renick Run Pump Station and grit gate, however, were decommissioned prior to December 2004. Given the prior decommission of the Renick Run Pump Station and grit gate and the failure of DSR 083 to discharge during the 2005 wet-weather event, we conclude that issues of fact remain as to the necessity of the isolation gates.

{¶ 51} The City also contends that closure of the isolation gates would have risked violating the federal Clean Water Act, the City's National Pollutant Discharge Elimination System permits, and the City's sanitary sewer overflow

consent orders with the state of Ohio by causing a sanitary-sewer overflow from the Old Main and Deshler Avenue Interceptor Sewer through DSR 083 into the Scioto River. Despite that argument, the City repaired the isolation gates within months after the January 2005 flooding and incorporated closure of those gates into the IISOP to permit isolation further upstream and avoid a situation where DSR 083 is unable to discharge because of the river elevation. A City analysis of the January 2005 flood lists the utilization of the isolation gates "to physically disconnect the sewer system north (upstream) of Greenlawn Avenue" as an operational change to prevent future flooding. A July 15, 2005 report entitled Whittier Street South Gates Saving Project stated that, after the January 2005 flooding, the City Department of Sewerage and Drainage "found that if the [isolation gates] were throttled during major rain events as needed, flooding could be slowed or eliminated." The report also stated that, upon repair, the Whittier Street isolation gates "can * * * be used during severe rain events to throttle flow accurately and reduce or completely eliminate sanitary flooding south of Whittier Street."

{¶ 52} The City argues that its actions and changes to the IISOP following the January 2005 flooding are subsequent remedial measures, evidence of which is not admissible to demonstrate negligence. We agree that evidence of subsequent measures is inadmissible to show that the City was negligent. Evid.R. 407 states that "[w]hen, after an injury or harm allegedly caused by an event, measures are taken which, if taken previously, would have made the injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event." The rule goes on, however, to state that evidence need not be excluded when it is "offered for another purpose, such as proving ownership, control, or feasibility of precautionary measures, if controverted, or impeachment." Here, the City disputes the feasibility of closing the isolation gates based on prohibitions against overflows from the Old Main and Deshler Avenue Interceptor Sewer. Evidence that the City subsequently repaired the isolation gates and incorporated the closure of those gates into the IISOP is admissible to demonstrate the feasibility of precautionary measures the City could have taken prior to the flooding event at issue, including prior repair of the isolation gates and requiring closure of those gates. See Berger v. Port Clinton (1993), 96 Ohio App.3d 45, 50, 644 N.E.2d 658; Kovach v. Newbury Industries, Inc. (Dec. 9, 1983), 11th Dist. No. 1105, 1983 WL 6002.

{¶ 53} Upon review, we conclude that genuine issues of material fact remain as to whether the City was negligent in its failure to maintain the isolation gates and require their closure and that the trial court did not err by denying the City's

motion for summary judgment based on its assertion of immunity for that claim. Therefore, we overrule the City's fourth assignment of error.

{¶ 54} In its fifth assignment of error, the City claims that the trial court erred by concluding that the City is not immune from liability on Inland's claim that the City negligently operated the sludge pumps, which pumped settled sludge from the bottom of the Whittier Street Storm Tanks back into the OSIS, while the FDS North Gate was closed. The sludge pumps activate when water in the storm tanks reaches a depth of four feet. Although the sludge pumps can be turned off, nothing in the IISOP instructed City workers to do so. The City argues that Inland cannot identify any evidence that City employees failed to operate the sludge pumps with ordinary care or that the operation of the sludge pumps contributed to any loss suffered by Inland.

{¶ 55} According to Blake, if the sludge pumps were not operating, "solids could accumulate in the tank and ultimately discharge over the weir and potentially plug the sludge collection mechanism." Hickman stated that the Whittier Facility's bridge motors would also be at risk of overloading if sludge build-up caused an obstruction to the bridge. Hickman also testified that any volume pumped out of the storm tanks by the sludge pumps was inconsequential because the volume of water rushing through the storm tanks during a high-flow event limits the settlement of sludge to the bottom of the tanks. Blake concurred that "the contribution of wastewater from the sludge pumps [to the OSIS was] deminimis and had minimal, if any, effect on the surcharging." Budny, on the other hand, identified the operation of the sludge pumps as one cause of the surcharge in the OSIS. He testified that the pumps were adding heavily polluted flow to the OSIS and opined that the City should have turned the sludge pumps off and permitted solids to collect in the bottom of the storm tanks. Budny contested the City's position that allowing sludge to collect in the tanks would harm the pumps.

{¶ 56} Following the January 2005 flooding, the City identified proposed actions to protect against future flooding from surcharging in the OSIS, including a recommendation that the sludge pumps be turned off. Although Blake testified that such a step "was only added to the wet weather operational plan after the [2005] flood event" and is, therefore, a subsequent remedial measure, evidence of that change is admissible under Evid.R. 407 to counter the City's assertion that deactivating the sludge pumps was not feasible because of potential harm to the pumps and/or other components of the Whittier Facility. Viewing the evidence in the light most favorable to Inland, reasonable minds could conclude that the City was negligent in its continued operation of the sludge pumps while the FDS North Gate was closed. Therefore, the trial court did not err in denying the City

summary judgment, based on political subdivision immunity, on this claim, and we overrule the City's fifth assignment of error.

{¶ 57} The City's sixth assignment of error states that the trial court erred by concluding that the City is not immune from liability on Inland's claim that the City negligently operated the grit gate in Berliner Park.  As with its third assignment of error, regarding the operation of the FDS North Gate, the City contends that the operation of the grit gate was a flood-control measure and, therefore, a governmental function.  Alternatively, the City argues that Inland failed to establish a genuine issue of material fact as to whether City employees negligently operated the grit gate.

{¶ 58} Although the grit gate was decommissioned prior to December 2004, and although the IISOP did not call for operation of the grit gate, the grit gate was closed for several hours during the January 2005 wet weather event.  In his second affidavit, Hickman states as follows:

> During the wet weather event occurring in January 2005, [the grit gate] was closed in an attempt to gain control of a situation that was beyond the normal control of the collection system and treatment plants.  Based on the massive quantity of water inundating the City's sewer system, there was concern that the OSIS might have actually failed structurally and was taking in river water directly.  Given the circumstances * * *, flooding was occurring at the Berliner Park Grit Tank Facility and the [grit gate] was closed to determine if it would isolate or rectify the situation.  The effects that were observed after closing the [grit gate] suggested the flooding worsened rather than improved.  Accordingly, city employees reopened the [grit gate].

The "January 2005 Flood Analysis" attached to Hickman's second deposition transcript states that the grit gate was closed at 10:15 a.m. on January 3, 2005, and reopened at 3:00 that afternoon.  Hickman explained that he and Doug Wise, upon observing water flooding from the ground in Berliner Park, closed the grit gate "on the fly * * * to isolate it off to see if we could keep that water from flooding out the [park]."  Hickman stated that "we were looking for gates to close to see if we could isolate even further and keep any water from anywhere coming in.  And so we closed that gate down, and that actually increased the flooding of the park, so we cracked it back open again."

{¶ 59} Inland opposes the City's assertion that the operation of the grit gate was a flood-control measure, but the record contains no evidence disputing Hickman's testimony that the grit gate was closed and reopened expressly to control the flooding Hickman was observing in Berliner Park.  The operation of the grit gate was not otherwise contemplated as part of the operations of the sewer system, having been decommissioned prior to December 2004.  Accordingly, the operation of the grit gate during the January 2005 wet-weather event

relates to the governmental function of flood control measures. Moreover, even were we to reject the City's contention that operation of the grit gate was a flood-control measure, the record contains no evidence from which reasonable minds could conclude that City employees acted negligently in that regard. Indeed, Inland's expert offered no opinion as to whether the operation of the grit gate was negligent or a cause of Inland's damages, and he, in fact, admitted that he did not even consider the operation of the grit gate in formulating his opinions for this case. Thus, we conclude that the trial court erred by concluding that the City did not establish entitlement to immunity on Inland's claim regarding operation of the grit gate, and we sustain the City's sixth assignment of error.

{¶ 60} Before moving on to the City's final assignment of error, we briefly discuss the City's argument, raised under several of the foregoing assignments of error, that Inland is unable to establish negligence because the record contains no affirmative evidence of the exact date and time of the sewer backups on Inland's property. It is undisputed that Inland suffered sewer backups on its property and in its plant in January 2005 as a result of surcharging in the OSIS. Blake stated that, when the surcharged OSIS was unable to relieve through DSR 083, it relieved at the next lowest elevations, located in Berliner Park and on Inland's property. The record contains evidence, including testimony from City employees, that specific actions or omissions, including the closure of the FDS North Gate and the failure to maintain the isolation gates in an operable manner, contributed to the surcharging on Inland's property. The record also contains evidence of the timing of sewer overflows in Berliner Park, immediately north of Inland's property, which the City maintains were similarly caused by the inability of the surcharged sewer to discharge at DSR 083. On the state of the record before the trial court on summary judgment, we conclude that the absence of testimony regarding the specific times of the backups onto Inland's property would not preclude a reasonable trier of fact from determining that Inland's damages were proximately caused by negligence on the part of the City. Accordingly, the trial court did not err in denying the City's motion for summary judgment based on the absence of such evidence.

{¶ 61} Finally, the City's second assignment of error asserts that the trial court erred in concluding that the defense in R.C. 2744.03(A)(5) did not reinstate the City's immunity on Inland's claim that the City negligently operated the sewer system. R.C. 2744.03(A)(5) provides that, despite the application of an exception to immunity under R.C. 2744.02(B), a political subdivision is immune from liability where a claimant's injury or loss "resulted from the exercise of judgment or discretion in determining whether to acquire, or how to use, equipment, supplies, materials, personnel, facilities, and other resources unless the judgment or discretion was exercised with malicious purpose, in bad faith, or

in a wanton or reckless manner." Under this assignment of error, the City exclusively argues that its decision whether to conduct hydraulic gradeline modeling of the effects of closing the FDS North Gate before adopting the IISOP in effect in January 2005 involved the exercise of judgment or discretion within the purview of R.C. 2744.03(A)(5). Inland responds that the City was not entitled to embark on a course of conduct without first considering the obvious consequences.

{¶ 62} The R.C. 2744.03(A)(5) defense extends to activities that involve weighing alternatives or making decisions involving a high degree of official judgment or discretion. *Essman*, 2010-Ohio-4837, at ¶ 54, citing *Enghauser Mfg. Co. v. Eriksson Eng. Ltd.* (1983), 6 Ohio St.3d 31, 6 OBR 53, 451 N.E.2d 228, paragraph two of the syllabus. In other words, "[i]mmunity attaches only to the broad type of discretion involving public policy made with 'the creative exercise of political judgment.'" *McVey v. Cincinnati* (1995), 109 Ohio App.3d 159, 163, 671 N.E.2d 1288, quoting *Bolding v. Dublin Local School Dist.* (June 15, 1995), 10th Dist. No. 94APE09–1307, 1995 WL 360227. "Some positive exercise of judgment that portrays a considered adoption of a particular course of conduct in relation to an object to be achieved is required in order to demonstrate an exercise of discretion for which R.C. 2744.03(A)(5) confers immunity from liability on a political subdivision." *Addis v. Howell* (2000), 137 Ohio App.3d 54, 60, 738 N.E.2d 37. A political subdivision may not simply assert that all of its decisions are discretionary under R.C. 2744.03(A)(5). *Hacker v. Cincinnati* (1998), 130 Ohio App.3d 764, 770, 721 N.E.2d 416. "To hold otherwise would be construing the grant of immunity under the Political Subdivision Tort Liability Act more broadly than we believe the legislature originally intended." Id. at 771, 721 N.E.2d 416.

{¶ 63} We agree with the City that the decision whether to utilize hydraulic gradeline modeling to predict the effects of closing the FDS North Gate constitutes an exercise of judgment or discretion under R.C. 2744.03(A)(5). Moreover, while some City employees were personally unaware of the use of hydraulic gradeline modeling to analyze the impact of closing the FDS North Gate, there is no affirmative evidence in the record to establish that the City failed to consider the consequences of that action before implementing step seven of the IISOP wet-weather plan. Further, however, the record contains evidence that the City did test the closure of the FDS North Gate prior to January 2005. Finally, the record contains evidence that the decision to require closure of the FDS North Gate, at least in certain situations, was a policy determination to aid the dewatering of the area protected by the floodwall.

{¶ 64} In further support of its argument that R.C. 2744.03(A)(5) is inapplicable, Inland maintains that the City exercised any discretion or judgment in a wanton and/or reckless manner. Inland did not, however, allege wanton and/or

reckless conduct by the City in its complaint, but instead alleged only that the City acted negligently. In *Elston v. Howland Local Schools,* 113 Ohio St.3d 314, 2007-Ohio-2070, 865 N.E.2d 845, ¶ 31, the Supreme Court of Ohio held that, where the complaint did not allege malice, bad faith, or wanton or reckless conduct, the appellate court improperly strayed beyond the pleadings by finding a genuine issue of material fact as to whether the actions of the political subdivision's employee could be characterized as malicious, wanton, reckless, or in bad faith. See also *Smith,* 176 Ohio App.3d 567, 2008-Ohio-2978, 892 N.E.2d 971, at ¶ 33; *Ohio Bell Tel. Co. v. Digioia–Suburban Excavating, L.L.C.,* 8th Dist. No. 89708, 2008-Ohio-1409, 2008 WL 802641, ¶ 38–40. Therefore, we do not consider Inland's arguments that the City acted in a wanton or reckless manner. Nevertheless, even were we to consider those arguments, reasonable minds could not conclude that the City acted recklessly or wantonly with respect to the determination of whether to utilize hydraulic gradeline modeling. For these reasons, we sustain the City's second assignment of error.

{¶ 65} For the forgoing reasons, we overrule the City's first, third, fourth, and fifth assignments of error and sustain the City's second and sixth assignments of error. We therefore affirm in part and reverse in part the judgment of the Franklin County Court of Common Pleas. We remand this matter to that court for further proceedings consistent with this decision and the law.

Judgment affirmed in part
and reversed in part,
and cause remanded.

BRYANT, P.J., and CONNOR, J., concur.